THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SYLVESTER WATSON, Defendant-Appellant.

First District (5th Division)    No. 79-1728

Opinion filed March 20, 1981.

552

[black redacted blocks]

Neville & Ward, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and John M. Hynes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

The defendant was tried by jury and found guilty of burglary, kidnapping, unlawful restraint, and rape. (Ill. Rev. Stat. 1979, ch. 38, pars. 19—1, 10—1, 10—3, 11—1.) He was sentenced to an extended term of 50 years imprisonment for the rape. Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2.

The three issues raised by this appeal are whether the prosecutor made improper comments during final arguments; whether evidence concerning blood types was improperly admitted; and whether it was proper to impose an extended sentence.

The material evidence follows: Beth R., the victim, testified that Sylvester Watson kidnapped her on February 5, 1979, from the parking lot of a school where she was a night student. During the initial struggle, he told her he had a gun and would kill her if she did not obey him. After ordering her to lie down in the back of her car, he drove the car around for 15 minutes. She noticed that he was wearing suede or leather gloves. While driving, he questioned her, among other things, about where she worked. She told him she worked in a record store. Eventually, he parked the car in an alley, near a light, went into the back, and for more than half an hour he raped her and committed deviate sexual assault. When he finished attacking her, he started a conversation in which he told her,

among other things, that she was nice, and that he wanted to be her friend. He also told her he would not let her go until she gave him her phone number, so she gave him a phony number. Both during and after the attack she had opportunities to study his face. When he got out of the car, she drove home and reported that she had been raped. Beth did not tell anyone about the deviate sexual assault, even though she was questioned on that subject at the hospital. The next day, she went to the Chicago Heights Police Department and looked at 1500 photographs, but did not pick out any of them as being pictures of potential suspects. Around March 1, 1979, while at the record store where she told him she worked, Beth saw the defendant enter the store. She ran to the back and told some other employees that the man who raped her was in the store. They ran out while Beth called the police, but the defendant was gone. Several days later, after viewing a lineup at the Markham Police Station, she identified Watson as the man who attacked her. It was not until April 1979, when she was interviewed by the prosecutors who tried the case, that she told about the deviate sexual assault. On cross-examination she admitted that she saw the rapist's arms. Despite this, the police reports did not describe the attacker as having tattoos.

Michael Podlecki, an employee of the Bureau of Law Enforcement, Department of Scientific Services, testified that semen found on Beth's clothes was from an individual with Type "O" blood. Eighty percent of all persons secrete a substance in fluids, including semen, which indicates blood type. Such people are referred to as "secretors." Beth's blood was Type "A", and Watson was a secretor with Type "O" blood. Forty percent of all Blacks and 50 percent of all Whites are Type "O".

The defendant's alibi witness, Lynn Jones Henderson, testified that she was having a long dinner with him at the time the crime occurred. Not until August 1979 did she become aware that the crime with which Watson was charged occurred while she was in a restaurant with him.

Testifying on his own behalf, the defendant admitted, on cross-examination, that when he was arrested in March of 1979, he was informed of the date and time of the crime he was accused of committing. Despite this knowledge, it was not until July 1979, after "racking his brain," that he remembered being with Henderson at the time Beth was being attacked.

The defendant also testified that he had a tattoo on his arm on February 5, 1979. The jury viewed the tattoo. In rebuttal, the State attempted to establish that defendant did not have a tattoo when arrested.

OPINION

Watson's first contention is that he did not receive a fair trial because, in rebuttal argument, the prosecutor allegedly (1) accused defense

counsel of being a mercenary who manufactured the defense; (2) gave unsworn testimony; (3) referred to defendant's post-arrest silence; (4) shifted the burden of proof to the defense; and (5) appealed to the passions and prejudices of the jury.

Since the comments to which defendant objects were made in the State's rebuttal argument, we look first to see whether they were invited or provoked by improper defense argument.

Along with the alibi defense, and the contention that this was a case of mistaken identity, the defense argued that there were reasonable doubts because the police reports did not list the attacker as being tattooed, and because the State's case omitted mentioning the results of early investigative leads and scientific tests. For example, hair samples were taken from the defendant, but not mentioned at trial. Since the need for a hair sample from Watson implied that a comparison standard had been recovered by the police, the defense attorney argued that this omission from the State's case must have meant that the State's own scientific tests showed that Watson was not the rapist. The defense attorney also argued that there were reasonable doubts because the State failed to produce other evidence which would have corroborated the State's version of the case, if it was in fact true.

■■ These arguments were proper because they were based on evidence presented at trial, and upon reasonable inferences drawn from the evidence. (*People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5.) In fact, these arguments show that defense counsel ably and zealously defended Watson in the face of an overwhelming prosecution case. However, at one point in his argument, defense counsel accused the State of falsifying and concealing evidence:

"A case is not only determined by evidence presented to you, it is the lack of evidence. It is the changing of evidence. It is the concealment of evidence."

Though it was fair and proper to argue that there were reasonable doubts about defendant's guilt (because the State failed to bring forth certain evidence and witnesses which would have corroborated the prosecution, if its version of the evidence was true), there was no basis, in this case, for accusing the State of either concealing evidence from the defense or of altering evidence. Therefore, this argument was improper.

■■ In addition to these comments, defense counsel brought up his personal beliefs and opinions. When arguing about how horrible the attack on Beth was, he said, "Of course it is tragic. It is terrible. Believe me, I resent it." In reference to whether, in April, she told the prosecutors about the deviate sexual assault, he said, "I don't know, but if we took her word, she told somebody in April and I am a little reluctant to do so." Also, in argument about Beth's testimony that the car motor was shut off

during the attack, defense counsel flatly declared, "I don't believe the motor was shut off * * *." These comments were improper because it is not permissible for a defense attorney, in argument to the jury, to express his or her personal belief or opinion in the truth or falsity of any testimony or evidence. ABA Standards, The Defense Function §7.8(b) (1971).

The responses made by the prosecution in rebuttal argument include three areas of improper comments: attacks on the defense attorney; statements which were not supported by the evidence; and comments which were designed to appeal to the passions and prejudices of the jury.

The attacks on defense counsel included repeated accusations that he was trying to confuse the issues and blind the jurors by blowing puffs of smoke in their faces. The prosecutor also said, about defense counsel:

(a) "He got up in his opening statement and said it was an unfortunate and brutal attack.

Apparently his heart went out to her, but his money comes from Sylvester, so when she got on the stand—and he tells you this was a terrible thing, bunk."

(b) "[His] job in this case is to see to it that Sylvester Watson walks out that dorr [sic], and he is a very good lawyer, I mean a four time loser like Sylvester doesn't go to any hack."

(c) Rape victims are reluctant to report the details of such assaults because, "there are good lawyers around like [the defense counsel] who can give them enough heat that they don't have enough courage to take the stand * * *."

■■ It was improper for the prosecutor to allege that defense counsel was trying to blind the jury with puffs of smoke. The primary rule governing final argument is that the argument must be based on facts in evidence, or upon reasonable inferences which can be drawn from these facts. (*People v. Vasquez.*) Thus it is improper for a prosecutor to argue, without a basis of actual evidence to support the accusation, that defense counsel suborned perjury or manufactured a fraudulent defense. (*People v. Polenick* (1950), 407 Ill. 337, 95 N.E.2d 414.) A criminal defendant's guilt or innocence is to be determined upon the evidence presented at trial, not upon the prosecutor's attacks on defense counsel. (*People v. Martin* (1975), 29 Ill. App. 3d 825, 331 N.E.2d 311.) Attorneys should try the evidence, not each other. *People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.

The State relies on cases which hold, for example, that it was permissible to refer to the defense version of the evidence as a "smoke screen." (*People v. Griggs* (1977), 51 Ill. App. 3d 224, 366 N.E.2d 581.) But, since the basic rule is that argument must be restricted to the evidence and reasonable inferences from the evidence, each case must be decided on its own facts. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338

N.E.2d 880.) Therefore, it can be misleading to rely on cases as holding that any particular phrase is or is not proper argument. The cases merely hold that argument was or was not proper based upon the facts of the particular case.

■■■ In the present case, part of the defense was to focus on each piece of evidence which the State omitted from its case. It was proper to argue that these omissions created a reasonable doubt, and it also would have been proper to respond that this defense was a "smoke screen." The initial problem here is that the defense attorney stepped out of bounds when he accused the State of concealing and altering evidence, and when he introduced his personal beliefs and opinions into argument. The State replied in kind. And even though the State's escalated response cannot be condoned, these improper rebuttal arguments were partially provoked and partially invited by the defense argument. *People v. Griggs* (1977), 51 Ill. App. 3d 224, 366 N.E.2d 581.

The second area of improper prosecution argument involved statements about the evidence that are not supported by the record.

The prosecutor gave unsworn testimony during his argument when he vouched for the complainant's testimony that, in April, she told the prosecutors about the deviate sexual assault: "[A]nd if he doesn't believe that I am going to tell you that it is true." Also, when referring to a fingerprint which was found on the rearview mirror of the complainant's car, and which could not be matched with defendant's prints, the prosecutor argued that "* * * Beth *could have told you*, the scientific evidence was going to come out a certain way." (Emphasis added.)

When the prosecutor commented on defendant's testimony (that ink was not allowed in the County Jail and that he could not have been tattooed there after his arrest), there was this exchange:

"PROSECUTOR: You all live in Cook County. You read the papers. They smuggle in a lot worse than Indian Ink.

DEFENSE COUNSEL: Judge, I object. There is no evidence in this record of anything smuggled into the jail.

THE COURT: Sustained."

In addition, the prosecutor misled the jury about when the State first had notice of the alibi defense. Despite the fact that, as the trial court noted, notice of alibi was given almost three weeks before trial, in rebuttal the prosecutor said that, "Yesterday, what you heard in Court; what I heard in Court [from the alibi witness], what I saw in Court was the first time I ever heard that * * *. The first time I had a chance to hear it. Just think about that."

The prosecutor also argued that the alibi witness was not credible because she did not inform the police or the prosecutors about the alibi defense.

■■ It is improper for a prosecutor, during argument, to state as evidence facts which are not supported by the record. (*People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19; *People v. Patterson* (1976), 44 Ill. App. 3d 894, 358 N.E.2d 1164.) Such argument constitutes unsworn testimony by a witness who is not subject to cross-examination, and it is not compatible with a fair criminal justice system.

While it was error for the prosecutor to have vouched for the veracity of part of the complainant's testimony, the error is harmless because, at one point in his argument, defense counsel conceded the point in question (that is, in April, Beth reported the deviate sexual assault to the prosecutors): "We don't know who she told. But she did tell finally * * *. She told the prosecutor about it in April."

We also conclude that, while it was error for the prosecutor to argue about what the complainant "could have told" the jury, the error was a matter of form, not substance, since the complainant testified that the defendant wore suede or leather gloves the entire time he drove. When the prosecutor argued that the complainant "could have told them" that the fingerprint on the rearview mirror was not the defendant's, this was really just asking the jurors to use their common sense to conclude that fingerprints would not go through gloves.

■■ The comment about smuggling ink into county jail was not based on the evidence, but the defense objection was promptly sustained and there is no reason to believe that the jury was unduly prejudiced by this remark. *People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256.

■■ In this case it was improper to argue that because she did not inform the State of the alibi, the alibi witness was not credible. These comments were not proper because the attempted impeachment was not supported by a proper evidentiary foundation. To establish a foundation for impeaching an alibi witness with prior silence, the State must show that the witness had an opportunity to inform the State of the alibi in circumstances where a reasonable person would have come forward with the information. For example, in *People v. McMath* (1968), 104 Ill. App. 2d 302, 244 N.E.2d 330, *aff'd* (1970), 45 Ill. 2d 33, 256 N.E.2d 835, *cert. denied* (1970), 400 U.S. 846, 27 L. Ed. 2d 83, 91 S. Ct. 92, the alibi witness called the police to report the crime, discussed it with the officers at the scene, and he saw that the defendant was arrested as a suspect. Having established this foundation, it was proper for the State to impeach his alibi testimony with his prior silence. Thus, it was proper to argue that a reasonable person, with the same opportunity to inform the police, would have come forward with information about the alibi. A similar foundation was established by the prosecutor in *People v. VanZile* (1977), 48 Ill. App. 3d 972, 363 N.E.2d 429, where defense witnesses were impeached with evidence that they refused to speak to State investigators.

In the present case, the State received notice of the alibi defense, but it apparently did not attempt to interview the alibi witness. In addition, there was no showing, as there was in *McMath*, and *VanZile*, of an opportunity to inform the State of the alibi in circumstances where a reasonable person would have stepped forward. Since there was no foundation for impeachment of the alibi witness, it necessarily follows that the argument based on this impeachment was also improper.

■■ The defendant also argues that the rebuttal argument about his alibi witness impeached him with his post-arrest silence, and that it shifted the burden of proof to the defense. We disagree. Cross-examination of alibi witnesses which impeaches them with their prior silence does not shift the burden of proof to the defendant because it is not his silence which is being questioned. (*People v. Outlaw* (1979), 75 Ill. App. 3d 626, 394 N.E.2d 541.) It necessarily follows that the argument upon which such impeachment is based does not shift the burden of proof. Furthermore, there is no violation of a defendant's privilege against self-incrimination when his alibi witnesses are impeached by evidence of their prior silence. *People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, *cert. denied* (1978), 436 U.S. 961, 56 L. Ed. 2d 399, 98 S. Ct. 2228.

■■ As for the effect of the improper comments which were made about the alibi defense, we believe that the defendant's testimony makes the errors harmless. Even though the defendant was arrested in early March 1979, and he knew he was charged with the crime that occurred on the evening of February 5, 1978, he admitted, on cross-examination, that it was not until the following July, after he had spent several months in jail and had concentrated on "racking his brain," that he remembered he had an alibi defense. Since the jury was entitled to consider the reasonableness of this testimony in deciding whether to give the alibi any weight, we believe that the prosecutor's improper arguments about the alibi were harmless beyond a reasonable doubt.

■■ We also conclude that the questioning about the defendant's knowledge of his alibi, and the argument upon which this cross-examination was based, did not constitute comment on the defendant's post-arrest silence. The reason for this conclusion is that the focus of the questioning was strictly limited to the question of when he first remembered he had an alibi. There was no mention of, or even a hint at, any failure to inform the authorities. (See *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *People v. Green* (1979), 74 Ill. 2d 444, 386 N.E.2d 272.) However, we note that one of the reasons that there is no *Doyle* violation is because of the particular answer given. If a defendant was asked similar questions, and he answered that he had been aware of his alibi defense from the moment of his arrest and charging, then this might violate *Doyle*

by implying that he should have informed the authorities, at that time, of his defense.

The third area of improper prosecution argument concerns comments which were designed to inflame the passions and prejudices of the jurors:

> "PROSECUTOR: I hope somewhere on the jury it shocked you that he only spent two years or something for four armed robberies.
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Sustained.
>
> PROSECUTOR: You people don't live in a vacuum. You know what plea-bargaining is all about and you know how he got those two years.
>
> DEFENSE COUNSEL: Will you say sustained so that the jury can hear you?
>
> THE COURT: I said sustained."

In addition, the prosecutor told the jury that the defense attorney kept a report from going into evidence. The defense attorney used the report to impeach a witness, but he refused the prosecutor's magnanimous offer to let the entire report be admitted into evidence. In his rebuttal argument, the prosecutor told the jury, "He struggled to keep that report out."

■■ The comment about plea negotiations (which resulted in defendant's prior convictions) was designed solely to prejudice the jury. These statements were improper. However, the error was cured when the court sustained a prompt objection. *People v. Price.*

■■ Furthermore, telling the jury that defense counsel kept them from receiving inadmissible evidence is also grossly improper. (*People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402.) The prosecution cannot seek to have inadmissible evidence introduced at trial, and then complain to the jury that the defense is keeping things from them. The effect of this tactic is to punish the defense for invoking the right to keep such incompetent evidence from the jury.

Since we conclude that there was improper argument by the prosecutor, the remaining question is whether the error is reversible. A conviction will not be reversed because of improper argument unless the improper statements constituted a material factor in the conviction, or resulted in substantial prejudice to the accused. (*People v. Price.*) A fair reading of the record shows that the evidence is overwhelming. We are convinced, beyond a reasonable doubt, that the verdict would have been the same even if the improper argument had not been made. We hold that the improper arguments that were made in this case were either invited, provoked, cured, or harmless beyond a reasonable doubt. Nevertheless,

we are gravely concerned about the conduct engaged in by the prosecution in this case. At some point, the need to deter prosecutors from making grossly improper statements during argument may make it necessary for us to reverse convictions even though the evidence is overwhelming and the error could be considered harmless. We trust that prosecutors understand the theory of general deterrence and that they will take steps to prevent repetitions of the transgressions we have discussed.

■■ ■ The second issue raised on appeal is that it was improper to permit the State to introduce evidence about blood types. Since this issue was not raised at trial, or by post-trial motion, the contention was waived. Despite the waiver, it is argued that we should consider this issue as plain error under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1979, ch. 110A, par. 615(a)), or in the alternative, that it was incompetence for trial counsel to neglect this issue. We disagree with both contentions.

The plain-error rule can be invoked, as a matter of grace, to save an issue from the harsh waiver rule. (*People v. Lamparter* (1977), 56 Ill. App. 3d 823, 371 N.E.2d 997.) For example, it is appropriate to invoke the plain error rule where the trial error deprived the defendant of a substantial means of achieving a fair trial, or when the evidence is close. (*People v. Lamparter.*) In the present case, the State's case was overwhelming. And, we do not believe that the admission of such speculative evidence deprived the defendant of a substantial means to a fair trial. We conclude that this is not an appropriate case for application of the plain error rule. Furthermore, it was not incompetence for the defense attorney to let this evidence go to the jury. Counsel had a tactical choice of either objecting to the evidence at trial, or of arguing to the jury that the State's own witness agreed that this evidence was too remote and speculative to be probative. Thus, it could be argued that, if this was the best the State could do in terms of scientific evidence, then they had a poor case. Defense counsel chose the second tactic. By no means did this tactical decision reduce the trial to a farce and a mockery or show a lack of the diligence which is required of trial counsel. (See, *e.g., People v. Lamparter.*) Therefore, we conclude that the failure to object to the admission of such speculative evidence was not incompetence of counsel.

■■ The last contention is that it was improper to sentence defendant to an extended term of imprisonment. He was sentenced to prison for rape, a Class X felony. (Ill. Rev. Stat. 1979, ch. 38, par. 11—1(c).) The normal sentence for a Class X felony is between 6 and 30 years. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(3).) But, an extended term of between 30 and 60 years may be imposed for a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2) if the judge finds that either (1) the defendant was convicted of a Class X felony within the past 10 years or (2) the present

offense was accompanied by exceptionally heinous behavior indicative of wanton cruelty. Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b).

It is argued that the record does not support a finding of exceptionally brutal or heinous behavior. However, when the judge imposed sentence, he noted that the defendant had a record of four armed robbery convictions. Of course, armed robbery is a Class X felony. (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(b).) Despite this, the defendant contends that the only basis for the extended term was the judge's allegedly erroneous finding of exceptional brutality or heinous behavior.

We note that the finding of heinous behavior is on the same page of the record on which the judge announced the length of the term. However, this does not mean that the extended term was based solely on a finding of exceptional brutality. Two pages earlier, at the very beginning of the statement which concluded with the imposition of sentence, the judge noted defendant's armed robbery convictions. We will not impose a requirement that the finding upon which an extended term is imposed, and the actual sentence, be on the same page in the record. A fair reading of the record from the sentencing hearing shows that the extended term was properly based on defendant's prior convictions. Therefore, we need not consider whether the record also supports a finding of heinous behavior. *People v. Butler* (1979), 78 Ill. App. 3d 809, 396 N.E.2d 1374.

In addition, defendant contends that the sentence was excessive. He asks us to consider that he was 25 when sentenced, and that he has a wife and children. The standard of review for a sentence claimed to be excessive is whether the trial court abused its discretion. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

We are unable to conclude that there was an abuse of discretion in this case. The judgment is accordingly affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.