THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRIAN BEALS, Defendant-Appellant.

First District (5th Division)   No. 1—90—0969

Opinion filed November 13, 1992.

Rita A. Fry, Public Defender, of Chicago (Greg Koster, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael P. Latz, and Matthew L. Moodhe, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Following a jury trial, defendant Brian Beals was convicted of first degree murder and aggravated battery and sentenced to concurrent terms of 80 years for the murder and five years for the aggravated battery. On appeal, defendant contends that: (1) he was denied effective assistance of counsel; (2) the trial court improperly consid-

ered that defendant's conduct resulted in the taking of a life; (3) the trial court erroneously believed that defendant was eligible for a sentence of natural life imprisonment; and (4) the trial court abused its discretion when it imposed an 80-year extended-term sentence.

At trial, Valerie Campbell testified that on the afternoon of November 16, 1988, she was walking with her sons, Cordell, Antonio, and Demetrius, and her boyfriend, Derrick Lewis, in the vicinity of 60th Street and Normal when they encountered Steven Johnson and defendant arguing on the sidewalk. Valerie and her sons continued to walk down 60th Street past Steven Johnson and defendant, but Lewis stayed behind. Lewis told Valerie that he would meet her at her mother's house. Lewis and Johnson then entered Johnson's car and drove away. Valerie testified that she then observed defendant get into a car and drive down 60th Street toward Valerie and her sons. As Valerie and her sons were crossing 60th Street, Valerie observed defendant point a gun out of the driver's side window of his car. Valerie and her sons started running. Valerie then heard a "pow" and observed her six-year-old son Demetrius look back at the car, say "ouch" and fall to the ground. She heard a second shot and felt a pinch in her left leg. Valerie picked up Demetrius and ran with the other boys toward a house on 60th Street. While they hid under the porch of the house, they observed defendant get out of his car and look around for a few minutes. Defendant then got back into his car and drove away. Valerie discovered that her son Demetrius had been shot in the neck and that she had been shot in the leg. Demetrius later died as a result of the gunshot wound.

Antonio Campbell testified that defendant was wearing a bright Adidas jacket while defendant argued with Johnson on the sidewalk. After Lewis and Johnson entered Johnson's car and drove away from defendant, Antonio observed defendant run into a house. Antonio next observed defendant in his car shooting at Antonio, his brothers, and his mother.

Steven Johnson testified that on November 16, 1988, during the afternoon hours, he went to 451 West 60th Street in Chicago to talk to a woman known as "CC." Johnson told CC that she should not allow defendant to live in the building because defendant sold drugs. During this conversation, defendant arrived and told Johnson that defendant could sell drugs wherever he wanted. While defendant and Johnson were arguing on the sidewalk in front of the building, Valerie, her sons, and Lewis walked past. Lewis told Johnson to stop fighting and then Lewis and Johnson got into Johnson's car and

drove away. Johnson noticed that defendant was wearing a jacket during their argument.

Both Johnson and Derrick Lewis testified that they heard two shots. They proceeded to Valerie's mother's house, and on their way noticed Valerie on a porch. Valerie described the shooter to Lewis and Lewis led police to defendant's house.

Officer Wilson testified that when he arrived at defendant's house, he observed defendant running into the house. When Wilson entered the home, defendant's friend Mark Terrell told the officer that defendant was not home. Officer Wilson searched the house and found defendant hiding under a sheet in the basement.

Detective Ptak testified that after defendant was taken into custody, he and Antonio and Cordell Campbell proceeded to Mark Terrell's home. Detective Ptak recovered a jacket from Terrell's automobile which Cordell indicated was the jacket worn by defendant during the shooting. One of Valerie's sons later identified a car as the one driven by defendant during the shooting. Detective Ptak testified that the mobile crime lab performed a gunshot residue test on Lewis, Johnson and defendant in order to determine whether any of these individuals had fired a gun. The detective testified that these tests were inconclusive since they were conducted approximately three hours after the shooting. Detective Ptak also testified that he had no special training with regard to the gunshot residue test and he had not administered the test.

Norman Yancy testified on defendant's behalf that when he looked out the window of his home at 443 West 60th Street on November 16, 1988, he saw two men across the street, one standing on the sidewalk, and the other standing in a vacant lot. Yancy testified that he observed one of the men shooting in a westerly direction, and a blue or black sports car travel eastbound on 60th Street, pull into the alley, and pick up the shooter. On cross-examination, Yancy stated that he never described the driver of the getaway car to defense counsel as 6 feet 5 inches tall, light-skinned, and 20 to 23 years old. Yancy admitted that he never offered police any information on the shooting. Yancy also denied that he told the police that the shooting occurred in the summer.

Sidney Cobb testified on defendant's behalf that on the afternoon of the shooting, he was with defendant in the apartment on 60th Street. Cobb testified that defendant left the apartment, went downstairs, and talked to Johnson, who was at the front door. Cobb testified that defendant returned to the apartment, grabbed his jacket, and left the apartment. According to Cobb, defendant did not have a

weapon. Cobb testified that he observed defendant drive away in his automobile and a man shooting at defendant's car. Cobb testified he saw the man shoot in a westerly direction and then run into the alley. Cobb admitted that he never offered the police any information regarding the shooting.

Defendant testified on his own behalf that at the time of the shooting he was a fourth-year student at Southern Illinois University. Defendant testified that on November 16, 1988, he was in his apartment at 541 West 60th Street with Cobb when he saw Johnson in front of the building. Defendant went downstairs and he and Johnson got into an argument. Defendant stated that during the argument, Valerie, her sons and Lewis approached. Defendant testified that Lewis remained behind while Valerie and her sons continued to walk down 60th Street. Defendant testified that Johnson drove off and defendant went up to his apartment and got his jacket and car keys. Defendant testified that while he walked toward his car, he observed two men running toward him, one with a gun. Defendant entered his car and drove away. Through his rearview mirror, he saw a man in the alley firing shots at his car. Defendant testified that he went to Mark Terrell's house and then to his mother's house. After defendant heard a knock on the door, he proceeded to the basement, but never covered himself with a sheet. Defendant testified that he thought the police were looking for him in regard to an unlawful use of a weapon (UUW) warrant. Defendant also testified that the UUW case had been dismissed. Defendant testified he was not wearing his Adidas jacket during his argument with Johnson.

At the close of defendant's case, the parties stipulated that in an interview with defense counsel, Norman Yancy described the driver of the getaway car as 6 feet 5 inches tall, light-skinned, thin, and 20 to 30 years old. The parties also stipulated that Sidney Cobb, in an interview with defense counsel, had stated that when defendant first went downstairs to speak with Johnson, defendant wore his red and white Adidas jacket.

Defendant alleges that he was denied effective assistance of counsel because his trial counsel: (1) stipulated to testimony that impeached his own witnesses; (2) did not object to certain testimony; and (3) did not raise certain issues in defendant's motion for a new trial. In order to succeed on a claim of ineffective assistance of counsel, defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104

S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.

The record here reveals that defendant was indeed denied effective assistance of counsel where defense counsel stipulated to information counsel received from two defense witnesses. At trial, Sidney Cobb testified that after defendant's argument with Johnson, defendant returned to his apartment to pick up his Adidas jacket. What is significant about this testimony is the fact the prosecutor argued that defendant was already wearing his jacket while he was arguing with Johnson, and that the reason defendant returned to his apartment after the argument was to pick up his gun. Despite the significance of this testimony, defense counsel stipulated that in an interview conducted several months after the incident of November 16, 1988, Sidney Cobb told defense counsel that defendant was wearing his red Adidas jacket while arguing with Johnson.

Also critical to this case was the testimony of Norman Yancy. Yancy testified at trial that on the afternoon of November 16, 1988, he looked out the window of his home at 443 West 60th Street and observed two men across the street, one man standing on the sidewalk, the other standing in a vacant lot. Yancy testified that he saw one of the men shoot in a westerly direction and then enter a blue or black sports car, and travel eastbound on 60th Street. On cross-examination, Yancy testified that he never described the driver of the getaway car to defense counsel as 6 feet 5 inches tall, light-skinned, and 20 to 30 years old. At the close of defendant's case, the parties stipulated that Yancy spoke with defense counsel in April of 1989 and at that time described the driver of the get away car as 6 feet 5 inches tall, light-skinned, thin and 20 to 30 years old, a description that fit the defendant.

■ The State points out that a reviewing court will not extend its inquiry into areas involving the exercise of judgment, discretion, trial tactics or strategy. (*People v. Ayala* (1986), 142 Ill. App. 3d 93, 491 N.E.2d 154.) In some instances, the decision whether to enter into a stipulation is considered to be a matter of trial strategy. (See *People v. Pierce* (1991), 223 Ill. App. 3d 423) (stipulating that defendant voluntarily gave a tape-recorded confession was considered trial strategy where the statement would have been properly admitted without the stipulation and counsel used the stipulation to minimize the harmful effects of the confession and enhance the credibility of the defense).) The stipulation entered into in the instant case, however, cannot be considered trial strategy since it destroyed the credibility of the defense. Trial counsel personally testified by way of stipu-

lation against his own client. Counsel testified to critical information impeaching two key defense witnesses, Norman Yancy and Sidney Cobb, thereby destroying the credibility of the only witnesses to corroborate defendant's version of events. What is particularly damaging about counsel's stipulations is the fact that trial counsel offered his own professional standing and credibility against the defendant and the defense witnesses. Certainly, we cannot underestimate the impact counsel's testimony must have had on the jury.

Not only was defense counsel's performance seriously deficient and severely prejudicial to defendant's case, but counsel violated the Illinois Rules of Professional Conduct by testifying against his own client. Rule 3.7(b) of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 3.7(b)) provides that, "If a lawyer knows *** that [he] may be called as a witness other than on behalf of his own client, the lawyer may accept or continue the representation until the lawyer knows or reasonably should know that the lawyer's testimony is or may be prejudicial to the client." Clearly counsel should reasonably have known that his testimony would have a devastating impact on defendant's case. Accordingly, this case must be remanded for a new trial.

■ Defendant also argues that his trial counsel was ineffective because he allowed the prosecutor to personally give testimony that impeached one of defendant's witnesses. Norman Yancy testified at trial that the shooting of Demetrius and Valerie Campbell took place on November 16, 1988. On cross-examination, the prosecutor asked Norman, "Did you just tell me five minutes ago [out in the hallway] that you thought it happened in the summertime?" After Norman denied telling prosecutor Hennelly that the shooting happened in the summer, prosecutor Hennelly called Assistant State's Attorney Elizabeth Rivera to the stand and she testified that she was present when Norman told prosecutor Hennelly that the shooting occurred in the summer. Defendant contends that he was denied effective assistance of counsel when defense counsel failed to object to the prosecutor serving as both an advocate and a witness. Defendant's argument is misleading and ultimately meritless, however, since our review of the record reveals that Assistant State's Attorney Rivera was not involved in the prosecution of defendant's case.

■ Defendant next maintains that his trial counsel proved ineffective by failing to object to Officer Ptak's testimony regarding gunshot residue. Officer Ptak testified that gunshot residue tests were "very inconclusive" when performed two or three hours after the incident. Defendant maintains that trial counsel should have objected to Officer Ptak's testimony since a police officer is not qualified to tes-

tify as to the interpretation of gunshot residue. (See *People v. Perry* (1974), 19 Ill. App. 3d 254, 311 N.E.2d 341) (police officer was not qualified to testify concerning the amount of pressure necessary on the trigger to discharge a gun).) While trial counsel did not object to Officer Ptak's testimony, counsel did bring out in cross-examination the fact that Officer Ptak had no special training in the area of gunpowder residue analysis. Furthermore, the parties stipulated that gun residue tests done on the defendant three hours after the incident were inconclusive. Accordingly, even if defendant should have objected to this testimony, we find that because trial counsel brought out in cross-examination Officer Ptak's lack of expertise in gunpowder residue analysis, and the parties stipulated that the test was inconclusive, defendant was not prejudiced by trial counsel's failure to object.

Defendant's next contention of ineffective assistance of counsel concerns trial counsel's failure to object to prior consistent statements bolstering the testimony of prosecution witnesses. A prior consistent statement may be admitted to rebut an inference that the testimony is a recent fabrication or an inference that the witness has a motive to testify falsely, provided that the prior consistent statement was made before the time of the alleged fabrication or before the motive to lie came into existence. *People v. Deavers* (1991), 220 Ill. App. 3d 1057, 580 N.E.2d 1367.

■ Valerie Campbell testified at trial that immediately after the shooting, she informed Lewis that she and her son had been shot by the "fat guy" and Lewis told her the "fat guy" was Brian Beals. In addition, Steven Johnson, Derrick Lewis, and Officer Michael Wilson testified that Valerie told them that she was shot by the "fat guy," and that the "fat guy" was Brian Beals. These statements are not admissible as prior consistent statements in light of the fact that trial counsel never implied that the witnesses' testimony was a recent fabrication or that the witnesses had a motive to testify falsely. Because trial counsel did not object to these statements, and because the statements improperly bolstered the credibility of witnesses whose testimony was critical to this case, this is yet another reason to remand this case for a new trial.

In light of our decision to remand this matter for a new trial, we need not address defendant's contention that he received ineffective assistance of counsel where trial counsel failed to raise certain matters in his motion for a new trial.

■ We instead turn to the issues that may arise on remand. Defendant raises several errors that the trial court allegedly made in sentencing defendant. Defendant first contends that the trial court

improperly considered as a factor in aggravation that the defendant's conduct resulted in the victim's death. While it is proper for the trial court to consider as an aggravating factor the force employed and the physical manner in which the victim's death was brought about, it is improper for the trial court to consider the death of the victim as an aggravating factor where death is implicit in the offense. *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138.

The trial court here stated:

"In aggravation the first guideline indicated in the statute is 'Whether the conduct of the defendant caused or threatened serious harm.' Well we all know that your conduct caused the ultimate harm. It caused the loss of human life ***."

These comments are similar to those made by the trial court and found by this court to be improper in *People v. Willis* (1991), 210 Ill. App. 3d 379, 388, 569 N.E.2d 113 (wherein the trial court commented that, "As aggravation of course, I must consider what happened, the nature of the occurrence and the seriousness of the harm; and I'm sure there's no disagreement that the harm in this case is the most serious type, the taking of a life"). Accordingly, if after his new trial defendant is found guilty, the trial court must not consider the victim's death as an aggravating factor in defendant's new sentencing hearing.

Due to our disposition of this case, we need not and do not consider defendant's other allegations of error at the sentencing hearing.

Accordingly, for the reasons stated above, defendant's conviction is reversed and this matter is remanded for a new trial.

Reversed and remanded.

MURRAY and GORDON, JJ., concur.